# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 14-10165

————

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

WALTER R. HUDSPETH; JOESEPHIS AUSTIN; PATRICIA A. BRYANT,

Defendants - Appellants

_____

Cons w/ 14-10843

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

LISA L. HOLLIER,

Defendant - Appellant

————————

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CR-211-9

————————

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.

United States Court of Appeals
Fifth Circuit

**FILED**

February 12, 2016

Lyle W. Cayce
Clerk

No. 14-10165 cons/w No. 14-10843

PER CURIAM:*

Defendants Walter Hudspeth, Joesephis Austin, Patricia Bryant, and Lisa Hollier challenge the sufficiency of the evidence supporting their convictions for conspiracy to distribute hydrocodone outside the scope of professional practice and without a legitimate medical purpose. Hudspeth also challenges the district court's decision to depart upwards from the Sentencing Guidelines in imposing his 72-month sentence.  We affirm.

I.

Dr. Nicholas Padron, a physician, operated a clinic where he wrote illegitimate prescriptions to patients seeking hydrocodone in exchange for cash. He pled guilty and served as the lead witness for the government against defendants, who pled not guilty and proceeded to trial. Padron testified that he obtained new patients through the use of "patient herders," or individuals who would bring new patients to the clinic in exchange for cash or free medical services. He prescribed Xanax, promethazine with codeine, and hydrocodone, often without examining the patients brought in by the herders. At trial, Padron identified Hudspeth, Austin, and Bryant as patient herders. Hollier was the pharmacist in charge of Urban Independent Pharmacy, where she oversaw the fulfillment of many prescriptions written by Padron.

After months of investigation, federal agents searched Padron's clinic pursuant to a warrant. Based on the evidence obtained, a federal grand jury returned an indictment, charging Padron, Hudspeth, Austin, Bryant, Hollier, and several other patient herders with conspiracy to distribute hydrocodone outside the scope of professional practice and without a legitimate medical purpose.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10165 cons/w No. 14-10843

## II.

Defendants first argue insufficiency of evidence. All defendants timely moved for a judgment of acquittal during trial. Our review is de novo, viewing the evidence in the light most favorable to the Government, asking whether any rational jury could have found all of the essential elements of the offense beyond a reasonable doubt.[1] In this review, we accept all credibility choices and reasonable inferences tending to support the verdict and resolve any evidentiary conflict in favor of the verdict.[2]

The essential elements of conspiracy to distribute hydrocodone are "(1) an agreement by two or more persons to violate the narcotics law; (2) a defendant's knowledge of the agreement; and (3) his voluntary participation in the agreement."[3]

With respect to Hudspeth, the evidence indicates that he played a leadership role in the conspiracy. Padron testified that it was Hudspeth who first pitched the idea of the scheme. Indeed, Padron and Hudspeth formed the initial agreement at the root of the conspiracy. Padron also recounted that Hudspeth would bring ten to twenty patients a day to the clinic seeking prescriptions for controlled substances. Documentary evidence – clinic ledgers and videotape – corroborated Padron's testimony. Other patient herders testified that Hudspeth was a leader in the conspiracy. Hudspeth not only stood outside of the clinic on one occasion controlling admission, he also warned other members of the conspiracy after the arrest of some participants that "snitches be dealt with, so don't say nothing." A reasonable jury could have

---

[1] *United States v. Davis,* 735 F.3d 194, 198 (5th Cir. 2013).

[2] *See generally United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc) (abandoning use of the "equipoise rule" in evaluations of the sufficiency of the evidence).

[3] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (citing *United States v. Misher*, 99 F.3d 664, 677 (5th Cir. 1996)).

inferred knowledge of and intent to further the conspiracy's unlawful purpose from this evidence.

The evidence concerning Joesephis Austin's participation is also sufficient to affirm his conviction. Unlike Hudspeth, Austin's name does not frequently appear in the clinic appointment book, nor is it among the contacts in the cell phone the clinic used to communicate with herders. But the government put forth evidence at trial to explain the absence: Dr. Padron testified that Austin often accompanied Hudspeth to the clinic, joining him on his scheduled visits without a documented appointment of his own. A January 5th search by law enforcement at the clinic found Hudspeth and Austin at the clinic with a number of patients. Further, Austin's name did appear on a list of names and numbers maintained by the pharmacy that Dr. Padron later identified as a catalog of patient herders. Another patient herder identified Austin as a participant in the scheme, and Padron's front desk employee identified him as a regular at the clinic, coming in every 30 days with four to five patients. Austin also appeared regularly on surveillance video from the clinic.[4]

In arguing that there was insufficient evidence for his conviction, Austin noted that Dr. Padron did not incriminate Austin when Padron first met with investigators, naming Austin a coconspirator only after speaking to his lawyer. Austin's lawyer cross-examined Padron about the circumstances surrounding his identification of Austin as a herder in the presence of the jury. The jury

---

[4] Austin points to some inconsistencies in how he was identified in the footage. At different points during the investigation and trial, a government agent described a jacket with a Pepsi logo that Austin was wearing as being navy blue; other times, the agent said it was black. In some surveillance footage, Austin can be seen without a beard, although at trial the same government agent testified that Austin had a short grey beard. A reasonable trier of fact could infer that Austin's facial hair had changed during the course of the investigation, and that the agent was referring to the same jacket – which was later found at in the apartment where authorities arrested Austin – throughout the trial.

could have reasonably found Austin guilty of each of the elements of the conspiracy on the basis of the evidence presented.

The evidence is also sufficient to support Patricia Bryant's conviction. The government put forth evidence that Bryant was one of several persons who regularly brought in groups of patients to the clinic, sometimes with her son Allen Burkins, who pled guilty to charges stemming from the conspiracy and whose appeal was dismissed as frivolous by this court.[5]

Bryant argues that she was merely acting as a caregiver to the patients that she brought to Padron's clinic. But the government offered a different narrative, which a reasonable jury could have accepted. Padron testified that Bryant received benefits for bringing in patients, including free visits to the clinic for herself, that Bryant paid him cash for delivering the prescriptions to the patients, and negotiated a lower rate when Bryant had some financial difficulties. At trial, the government introduced videos that showed Bryant visiting the clinic and the Urban Independent Pharmacy. The footage depicts Bryant obtaining a prescription in the name of an individual who was not present, receiving cash from at least one other individual, and making several trips back and forth between the clinic and the pharmacy with different groups of people in different vehicles. A reasonable jury could thus infer that Bryant knowingly and voluntarily participated in the conspiracy.

Finally, the evidence is sufficient to support the conviction of Lisa Hollier, pharmacist and part-owner at Urban Independent Pharmacy (UIP). Hollier contends that she never formed an agreement with Padron. She points out that Padron even testified to that effect. But the attorneys strenuously argued this point to the jury in closing,[6] and the jury was entitled to credit the

---

[5] *United States v. Burkins*, 618 F. App'x 423 (5th. Cir. 2015).

[6] Additionally, it is undisputed that the jury was properly charged, receiving a "mere presence" instruction as well as an instruction that they should take "great care" assessing

government's evidence suggesting that the two had come to an informal understanding. The government relied on a call that Hollier placed to Padron to set up a meeting to discuss streamlining the prescription process between the clinic and pharmacy. As a result of that meeting, patients no longer brought their own prescriptions to the pharmacy; instead, Hollier created a form that Padron would fax directly to the pharmacy. The form only covered promethazine, hydrocodone, and Xanax prescriptions.

The government called expert witnesses who explained that UIP exhibited all the signs of a "pill mill" under Hollier's watch. Some of those red flags include multiple people arriving together to fulfill prescriptions, groups with the same address filling prescriptions from the same provider, and prescriptions for the highest strength paid for primarily in cash. According to testimony from Mardesy Henderson, a patient herder, no one at UIP ever questioned the validity of the prescriptions when they were being filled for the same medicine, from the same doctor, at the same time, even when the patients all shared the same address – a local homeless shelter. Henderson testified that he only observed someone having difficulty obtaining a prescription when he wanted to pay with Medicaid, as opposed to cash.

The government argued that Hollier had reason to know that the prescriptions were illegitimate, and that her compliance with the system demonstrated her tacit consent with the scheme. On the faxed prescription forms that Hollier recommended to Padron, Padron routinely cited the same diagnosis – back pain or anxiety – without further detail. Over time, other pharmacies like CVS and Walgreens stopped accepting prescriptions from Padron's office. When UIP ran out of a certain strength of hydrocodone, usually

---

accomplice testimony and an instruction that Hollier's conspiracy conviction could not rest on violations of the Texas pharmaceutical regulations.

at the end of the month, Hollier would call Padron's clinic to tell them to prescribe a different strength.

This evidence is sufficient to uphold Hollier's conviction. Even though Padron denied that they had an agreement, a rational trier of fact could infer that Hollier knowingly participated in the scheme by meeting with Padron to streamline the process of filling prescriptions and by then processing group prescriptions as described by the herders, such as Henderson, and the government's expert witnesses. As other pharmacies realized, the prescriptions from Padron's office were illegitimate, "further supporting the jury's conclusion that Hollier's continued involvement reflected her knowledge and intent to contribute to the scheme.

## III.

Hudspeth also challenges his 72-month sentence on the ground that that the district court erred in upwardly departing from the guideline range of 46-57 months pursuant to U.S.S.G. § 4A1.3(a)(4)(A). Because Hudspeth did not dispute the procedural reasonableness of his sentence in the district court, appellate review of that issue is for plain error.[7]

"When making factual findings for sentencing purposes, district courts 'may consider any information which bears sufficient indicia of reliability to support its probable accuracy.'"[8] In this circuit, courts may consider information contained in a Pre-Sentence Report (PSR), because it "bears sufficient indicia

---

[7] *See United States v. Bottoms*, 602 F. App'x 1019, 1020 (5th Cir. 2015) (unpublished) (holding that plain error review was appropriate for complaint about upward departure under USSG § 4A1.3). To prevail under this standard of review, Hudspeth is required to show "(1) an error, (2) that is clear or obvious, and (3) that affected [his] substantial rights." *United States v. Phipps*, 595 F.3d 243, 248 (5th Cir. 2010). If he satisfies those elements, this court has discretion to remedy the error if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Salinas*, 480 F.3d 750, 756 (5th Cir. 2007).

[8] *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (quoting *United States v. Solis,* 299 F.3d 420, 455 (5th Cir. 2002)).

of reliability to be considered as evidence by the sentencing judge in making factual determinations."[9] A defendant may, of course, rebut the information in the PSR, but if he does not, the court is "free to adopt the PSR's findings."[10]

In this case, Hudspeth's PSR noted that his criminal history category "substantially under-represent[ed] the seriousness of [his] criminal history or the likelihood he will commit other crimes." Many of Hudspeth's convictions did not produce criminal history points for reasons unrelated to their seriousness.[11] The PSR described Hudspeth's actual criminal history using information retrieved through the National Crime Information Center and Texas Crime Information Center. Hudspeth presented no evidence that the information was inaccurate, and he concedes that he has 14 previous felony convictions and 14 misdemeanor convictions. In order to more accurately reflect his extensive criminal history, the district court modified his criminal history category from I to IV. Since Hudspeth's prior convictions were substantiated by the PSR – and unchallenged by the defense – the district court did not err in taking them into consideration for sentencing.

Nor did the district court commit a procedural error under USSG § 4A1.3. The rule allows upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."[12] To determine the extent of the departure, a court must use "as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most

---

[9] *United States v. Nava,* 624 F.3d 226, 231 (5th Cir. 2010) (quoting *United States v. Trujillo,* 502 F.3d 353, 357 (5th Cir. 2007)).

[10] *United States v. Rodriguez,* 602 F.3d 346, 363 (5th Cir. 2010).

[11] For instance, the Texas Department of Criminal Justice was unable to produce records of Hudspeth's date of release from state custody for several of his offenses, which meant that they could not be used to calculate his criminal history points.

[12] USSG § 4A1.3(a)(1).

closely resembles that of the defendant's."[13] Here, the court considered exactly that: Hudspeth's criminal history, as evidenced by the uncontested PSR. It considered this history in light of its experience "on the bench," and its "educated view," suggesting that the court was comparing Hudspeth to similarly situated defendants that had appeared before the court in the past.

Since the district court relied on uncontested information from the PSR and complied with USSG § 4A1.3(a), it did not err in departing upward. We therefore need not address the other prongs of plain error review.

AFFIRMED.

---

[13] USSG § 4A1.3(a)(4)(A).